UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

ROBERT KALANI,

        Plaintiff,

   v.

CASTLE VILLAGE LLC, FUJINAKA
PROPERTIES, L.P.,

        Defendants.

No. CIV. S-12-2330 LKK/CKD

**ORDER**

    Plaintiff is a wheelchair-bound resident of a mobile home park.  He sues defendants under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182 (prohibiting discrimination based on disability in "public accommodations"), and California state law, including the Unruh Act, Cal. Civ. Code § 51(f).[1]  The Second Amended Complaint ("Complaint") alleges that plaintiff has been denied full and equal access to facilities associated with the park – and that are available to

_____

[1] "A violation of the right of any individual under the federal Americans with Disabilities Act of 1990 (P.L. 101-336) shall also constitute a violation of this section," Cal. Civ. Code § 51(f), and subject the violator to penalties and liability for damages, Cal. Civ. Code § 52(a).

1

the general public.  Plaintiff specifically names the "Clubhouse" and its restroom, the sales and rental office located in the Clubhouse, and the parking lot serving the office and the Clubhouse, as non-accessible, public facilities.  The Complaint seeks injunctive relief under the ADA, and damages under state law.  The parties cross-move for summary judgment.

Defendants assert that (1) the court lacks subject matter jurisdiction because the mobile home park is not a public accommodation, (2) the Clubhouse is a "private club" and therefore exempt from the ADA pursuant to 42 U.S.C. § 12187 (incorporating 42 U.S.C. § 2000a(e)), (3) plaintiff lacks standing because he did not use these facilities as a member of the public, (4) defendants do not "operate, lease or manage" the facilities at issue, (5) defendants have now mooted the case by excluding the general public, and (6) the court should not exercise supplemental jurisdiction over the state claims.

Plaintiff asserts that (1) the Clubhouse and its restroom, the office and the parking lot are public accommodations, (2) he encountered architectural barriers when attempting to use these facilities, (3) an architectural barrier still bars access to the rental office, even after the other facilities were fixed, (4) defendants are jointly and severally liable, and (5) the claim regarding the removed barriers is not moot because California's Unruh Act provides for damages for encountered barriers without regard to whether they have since been fixed (Cal. Civ. Code § 52(a)).

## I.   MATERIAL FACTS

1.   Plaintiff Kalani is a person with a disability.

1    Plaintiff's Statement of Undisputed Facts in Support of Motion

2    for Summary Judgment ("PSUF") (ECF No. 41-7) ¶¶ 1-4.[2]  Kalani

3    cannot walk at all, and since 2002 or 2003, has used a wheelchair

4    for mobility.  Id. ¶ 4.[3]

5            2.   In 2004, plaintiff's wife purchased a mobile home

6    at Castle Mobile Home Park in Ione, CA.  Defendants' Separate

7    Statement of Undisputed Facts in Support of Motion for Summary

8    Judgment/Partial Summary Judgment; Request for Sanctions"

9    ("DSUF") (ECF No. 35-8) ¶ 9;[4] Deposition of Robert Kalani

10   (January 16, 2014) ("Kalani Depo.") (ECF No. 35-4) at 27-28.[5]

11   Plaintiff has been a resident of the park since then.  DSUF ¶¶ 1

12   & 7.

13           3.   Plaintiff has not purchased a mobile home from

14

15   [2] A citation to "PSUF" means that defendants have not genuinely

16   disputed the asserted fact, so this court can consider it to be
     undisputed for purposes of these cross-motions.

17   [3] Defendants assert that the dates are "disputed" because on

18   October 24, 2013, during a deposition in Kalani v. Nat'l Seating
     & Mobility, Inc., 13-cv-61 (E.D. Cal.) (Mendez, J.), plaintiff

19   could not recall exactly when he started using a wheelchair.
     Defendants' Response ("Def. Resp.") to PSUF (ECF No. 47-4) ¶ 4.

20   However, plaintiff's failure to recall the exact dates during a
     deposition does not place in dispute his two subsequent sworn

21   statements that he began using the wheelchair in 2002 or 2003.
     See Kalani, 13-cv-61, Kalani Decl. (December 23, 2013), ECF

22   No. 74-4 ¶ 2; Declaration of Plaintiff Robert Kalani (March 8,
     2014) ("R. Kalani SJ Decl. (3-8-2014)") (ECF No. 41-2) ¶ 2.

23

24   [4] A citation to "DSUF" means that plaintiff has not genuinely

25   disputed the asserted fact, so this court can consider it to be
     undisputed for purposes of these cross-motions.

26
     [5] See Exhibit B (ECF No. 35-4) to the Declaration of Catherine M.

27   Corfee (February 14, 2014) ("Corfee SJ Decl. (2-14-2004)") (ECF
     No. 35-2).

28

1    defendants during the years 2010-13.  DSUF ¶ 10.

2              4.   Defendants Castle Village LLC and Fujinaka

3    Properties, L.P. own the land on which the park is located.  DSUF

4    ¶ 2.

5              5.   Non-party Calaveras Valley Village, LLC

6    ("Calaveras"), is paid by defendant Fujinaka to manage the mobile

7    home park.  DSUF ¶ 3; Deposition of Mark Weiner (December 12,

8    2013) ("Weiner Depo.") (ECF No. 35-3) at 50.[6]

9              6.   Mark Weiner is the Managing Member of Calaveras.

10   DSUF ¶ 4.

11             7.   On February 12, 2014, two days before filing their

12   summary judgment motion, defendants undertook several actions

13   which, according to them, have excluded the general public from

14   the Clubhouse and restroom, the sales and rental office, and the

15   parking lot.  See Def. Resp. to PSUF ¶¶ 7-9, 21.  They have

16   thereupon declared those facilities to be a "private club," or

17   otherwise off-limits to the general public.  Id.

18                    **The Clubhouse and the Ramp**

19             8.   There is a Clubhouse located on the grounds of the

20   mobile home park.  DSUF ¶ 22; PSUF ¶ 8.

21             9.   Defendants Castle Village LLC and Fujinaka

22   Properties, L.P. own the building that houses the Clubhouse.

23   DSUF ¶ 2.

24             10.  There is a ramp, leading from the "right end" of

25   the parking lot, that provides a designated accessible entry to

26   _____

[6] See Exhibit C (ECF No. 35-3) to Corfee SJ Decl. (2-14-2014).

27   Non-party Mark Weiner is the managing member of Calaveras.  DSUF
     ¶ 4.  His deposition testimony was given on behalf of Fujinaka.

28

4

the Clubhouse.  PSUF ¶ 10-12; see Deposition of Kim R. Blackseth

(February 12, 2014) ("Blackseth Depo.") (ECF No. 41-6) at 133.[7]

        11.  On or about August 8, 2012, plaintiff tried to use

the ramp to enter the Clubhouse.  PSUF ¶ 10-12; see Blackseth

Depo. at 133.  The ramp "was improperly configured," because it

had "slope issues."  See Blackseth Depo. at 133.[8]

        12.  Kalani fell off the ramp, injuring himself.  PSUF

¶¶ 10-11.

        13.  There is an Activities Committee, comprised of

park residents, that plans, advertises, and puts on various

activities in the park.  Declaration of Patricia Martinez

(February 27, 2014) ("Martinez Oppo. Decl.") (ECF No. 40-3)

¶¶ 4-6.  Prior to 2007, "the modular home park manager was very

involved" with activities scheduled at the park.  Martinez Oppo.

Decl. ¶ 5.  However, Mark Weiner, on behalf of the owners and

managers, turned over responsibility for activities to the

residents themselves.  Id.  Thereupon, the residents held

meetings of the Activities Committee which were attended by the

modular home park manager "who would comment on proposed

activities on behalf of the modular home park, and confirm the

clubhouse availability for events we wanted to schedule."  Id.

        14.  Prior to February 12, 2014, the Activities

---

[7] See Exhibit D (ECF No. 41-6) to the Declaration of Tanya Moore
(March 10, 2014) ("Moore SJ Decl. (3-10-2014)") (ECF No. 41-5).

[8] Defendants say this is "disputed" because Blackseth,
defendants' expert, was confused, and may have been talking about
a different ramp.  Def. Resp. to PSUF ¶ 12.  The deposition
testimony shows however, that defendants' expert was not confused
about which ramp she was talking about.

1  Committee conducted Bingo games in the Clubhouse, that were open

2  to the general public.  PSUF ¶ 8;[9] Martinez Oppo. Decl. ¶¶ 6 & 8;

3  Declaration of Plaintiff Robert Kalani (February 28, 2014) ("R.

4  Kalani Oppo. Decl. (2-28-2014)") (ECF No. 40-1) ¶ 3.  The

5  Activities Committee publicly advertised the games to the general

6  public, leaving flyers at a Senior Center, the local market and

7  the pharmacy.  Martinez Oppo. Decl. ¶¶ 5-6.  In addition, a large

8  "A-frame" sign was posted on the sidewalk at the entrance to the

9  park advertising the Bingo games and inviting members of the

10  public to attend.  R. Kalani Oppo. Decl. (2-28-2014) ¶ 4.

11       15.  The Clubhouse Bingo games were attended by members

12  of the general public who learned of the games from the

13  advertisements or "just driving by the mobile home park."

14  R. Kalani Oppo. Decl. (2-28-2014) ¶ 3.[10]

15       16.  Prior to February 12, 2014, the Clubhouse and its

16  restroom were used by the public for craft sales, which was an

17  activity that accompanied the community's twice-yearly yard sale.

18  PSUF ¶ 8.[11]  The yard and craft sale was run by the Activities

19

20  [9] Defendants dispute plaintiffs' assertion that the Clubhouse
   "is" open to the public, but they do not dispute that the

21  Clubhouse and its restroom <u>were</u> open to the public prior to
   February 12, 2014.  <u>See</u> Def. Resp. to PSUF ¶ 8 ("As of February

22  12, 2014, the clubhouse is closed to the public").

23  [10] Mark Weiner would later advise the Activities Committee that
   Bingo games had to be open to the general public.  <u>Accord</u>, Cal.

24  Penal Code § 326.5(g) (regarding "Bingo games for charity,"
   "[a]ll bingo games shall be open to the public, not just to the

25  members of the authorized organization").

26  [11] Defendants do not dispute that the Clubhouse and its restroom

27  were used this way prior to February 12, 2014.  <u>See</u> Def. Resp. to
   PSUF ¶ 8.

28

6

Committee, which publicly advertises the yard sale in newspapers and "as inserts to the city's water bills." Martinez Oppo. Decl. ¶ 11. The yard and craft sales were "well attended by the public." Id. During the yard sales, "the public is permitted to use the restroom in the clubhouse." Id.

17. Plaintiff uses the Clubhouse to pay rent,[12] play bingo, play cards and talk to others. DSUF ¶ 12.

18. On or about February 12, 2014 "[a] notice was posted" – somewhere, defendants do not say where – stating that the Clubhouse "is not open to the public." DSUF ¶ 15.[13] A similar notice was "re-posted" "on the Clubhouse doors" on March 8, 2014, stating that "the facility is not open to the public." Declaration of Mark Weiner (March 10, 2014) ("Weiner Reply Decl. (3-10-2014)") (ECF No. 47-2) ¶ 11.

19. Also on March 8, 2014, Mark Weiner, on behalf of the management and the owners of the Clubhouse, mailed a letter to the mobile park community that the Clubhouse was no longer available for Bingo, or for the craft fair, and that the restroom was no longer available to the public. Weiner Reply Decl. (3-10-2014) ¶ 9.

---

[12] Residents own their own mobile homes, but pay rent for the land on which the homes are located. See Declaration of Mark Weiner (February 14, 2014) ("Weiner SJ Decl. (2-14-2014)") (ECF No. 35-7) ¶ 9.

[13] Plaintiff asserts that this is "disputed." See Plaintiff's Response ("Pl. Resp.") (ECF No. 40-6) to DSUF ¶ 8. However, plaintiff only disputes the significance of the posting, not that the posting occurred. Id. Plaintiff also complains that he cannot verify the existence of this posting since defendants do not disclose where the posting occurred. Id.

20.   On March 10, 2014, a sign was posted at the entrance to the mobile home park stating that the "CLUBHOUSE IS CLOSED TO THE PUBLIC."  Weiner Reply Decl. (3-10-2014) ¶ 12.

**The Sales Office**

21.   Inside the Clubhouse are two adjacent offices separated from each other by double doors.  PSUF ¶¶ 22 & 25; Weiner Depo. at 96-97.[14]  Upon entering the Clubhouse, the first office ("Office One") is immediately on the right.  Weiner Depo. at 96.  The entry door to that office is too narrow to fit plaintiff's wheelchair through, as it is less than 32 inches wide.  PSUF ¶ 32; Declaration of Plaintiff Robert Kalani (March 8, 2014) ("R. Kalani SJ Decl. (3-8-2014)") (ECF No. 41-2) ¶ 25.[15]

---

[14] Defendants assert that they are not two separate offices, but one large office with a double door between them.  The difference in description appears to be a quibble only, and not material.

[15] Defendants assert that this fact is "disputed."  Def. Resp. to PSUF ¶ 23.  However, they offer nothing to dispute the fact.  Rather, defendants <u>argue</u> that plaintiff does not have to use this door if he does not want to, since he can enter through Office Two and the double doors connecting it to Office One.  <u>Id.</u>  Defendants also object that the asserted fact "calls for an expert's conclusion and Plaintiff is not an expert."  <u>Id.</u>  The objection is frivolous, particularly in light of <u>Strong v. Valdez Fine Foods</u>, 724 F.3d 1042, 1045 (9th Cir. 2013) ("Even without precise measurements, Strong could support his case based on his own personal experience with the barriers").  Plaintiff's declaration shows that he is fully competent to make this declaration, because (1) he <u>personally measured</u> the doorway, and found that it was 29 inches wide, (2) he has been traveling through doorways, using his wheelchair, for eleven years, and has learned from experience that doorways that his wheelchair cannot fit through are less than 32 inches in width, and (3) he knows from his own experience that his wheelchair does not fit through the door to Office One.  None of this calls for expert opinion; plaintiff's own eye-witness account is sufficient.  <u>Strong</u>, 724 F.3d at 1045 (plaintiff's "personal observations, based on his prolonged experience with ADA-compliant (and non-compliant) access ramps, are enough to propel him past summary judgment").

22.   Prior to February 13, 2014, Office One was the sales office (or part of the sales office), and was used "to sell homes and lease spaces" in the mobile home park.  PSUF ¶ 7; Weiner SJ Decl. (2-14-2014) ¶ 4; Weiner Depo. at 103.

23.   Continuing on, one encounters the second office ("Office Two"), and the door leading into that office.[16]  Weiner Depo. at 97.

24.  The two offices are connected by a double door.  Weiner Oppo. Decl. (3-24-2014) ¶ 14.[17]  Accordingly, when all the doors are open or unlocked, plaintiff can access Office One by passing the narrow entry door to that office, entering Office Two through its entry door, and then entering Office One though the connecting double door.  See R. Kalani SJ Decl. (3-8-2014) ¶ 28.

25.   Prior to February 12, 2014, the sales and rental office, located in the Clubhouse, was open to members of the general public who would go to the Clubhouse and to the sales and rental office to discuss buying a home or renting a space in the park.  PSUF ¶ 7; Weiner Depo. at 97-98 ("visitors for sales purposes" would meet agents "in the clubhouse," and would "sometimes" go inside Office One), 103 (the purpose of the office was "[t]o operate the clubhouse and to sell homes and lease spaces").[18]

---

[16] There is no allegation that the entry door into Office Two is a problem for plaintiff, or is non-compliant under the ADA.

[17] There is no allegation that the double door is a problem for plaintiff, or is non-compliant under the ADA.

[18] Defendants dispute that the sales and leasing office "is" being used as a sales and leasing office open to the public, however,

26.   It is undisputed that the double door is sometimes locked, blocking plaintiff's access to Office One from Office Two.[19]

27.   On March 10, 2014, a sign was posted at the entrance to the mobile home park stating "No leasing or sales agent or services at Clubhouse."  Weiner Oppo. Decl. (3-24-2014) ¶ 12.

**The Parking Lot & Ramp**

28.   Plaintiff is entitled to park in accessible parking spaces, by virtue of a license plate and placard issued by the State of California.  PSUF ¶¶ 5 & 6.

29.   Prior to February 12, 2014, the parking lot serving the Clubhouse and the office were used by members of the public interested in buying a mobile home or leasing a space in the mobile home park.  PSUF ¶ 9; R. Kalani SJ Decl. (3-8-2014) ¶ 18.[20]

30.   On or about September 6, 2012, plaintiff Kalani parked in the parking space designated as "accessible" in front of the clubhouse.  PSUF ¶ 14.

they do not dispute that the office was used this way prior to February 13, 2014.  <u>See</u> Def. Resp. to PSUF ¶ 7 ("As of February 12, 2010 [sic], the sales and leasing office has closed.  The office is no longer open to the public, and the leasing and sales office has been move off site").

[19] However, it is disputed whether this occurs at a time when Office One is open and therefore accessible to able-bodied persons, or whether Office One is closed during those times, for reasons entirely unrelated to plaintiff's disability or access issues.  <u>See, e.g.</u>, Weiner Oppo. Decl. (3-24-2014) ¶ 13.

[20] Defendants do not dispute that the parking lot was used in this way prior to February 12, 2014.  Def. Resp. to PSUF ¶ 9.

31.   While attempting to use the "accessible" parking space, Kalani experienced difficulty transferring to his wheelchair.   The parking space had excessive slope, which threatened to tip the wheelchair over, and insufficient room, which made it difficult to maneuver.   PSUF ¶ 15 & 16; R. Kalani SJ Decl. (3-8-2014) ¶ 14.[21]

---

[21] Defendant claims that these facts are "disputed" because (1) plaintiff does not assert that the parking spot is "out of compliance with the access codes," (2) plaintiff has produced no "expert report" of non-compliance, (3) plaintiff has "failed to produce any measurements," (4) the asserted facts are "an unsupported conclusion," and (5) the asserted facts call for "an expert's conclusion," and "Plaintiff is not an expert."   Each of these objections is fully and finally disposed of by the discussion and holding of <u>Strong</u>, discussed above in the note to Undisputed Fact No. 21.   Plaintiff's burden at this stage is to present credible evidence – which includes his own testimony about his own first-hand, eye-witness accounts – that show that he encountered barriers that interfered with his full and equal enjoyment of a public accommodation.   This showing does not require plaintiff to establish which compliance code is being violated, to be an expert, to hire an expert, or to produce precise measurements of slope, width and length, when it is well within his own experience to know when he is being denied the full and equal enjoyment of a public accommodation.   Moreover, plaintiff's own sworn statement about his own experiences in trying to access a public accommodation – whether it involves him falling off a ramp or not – is not a legal "conclusion," but eye-witness testimony that this court can consider.   Given plaintiff's showing, it is defendants' burden to show that they are entitled to the safe harbor of the compliance codes. However, Defendant has presented no evidence of any kind to rebut plaintiffs' showing, or to show that they met the ADA compliance codes at the time plaintiff tried to use the facilities, and accordingly plaintiffs' factual assertions here are "undisputed."

Defendants make reference to the Weiner Deposition at pp. 116-17, but that testimony does not in any way rebut plaintiffs' showing. To the contrary, it tends to confirm plaintiffs' assertion, by noting that there was not enough space at that part of the parking lot to make the parking spot compliant, "and so the only place we could comply would be at the other end so that it would have the proper grade."   Weiner Depo. at 115.

**The Restroom**

32.   When plaintiff Kalani used the restroom in the Clubhouse on September 6, 2012, he found that there were not proper wheelchair clearances under the sink, so that he found it very difficult to use the sink.   PSUF ¶¶ 18-20; R. Kalani SJ Decl. (3-8-2014) ¶ 15.[22]

**Resolved Issues**

Plaintiffs concede that three barriers have been corrected. They are (1) the ramp to the Clubhouse,[23] (2) the accessible parking spot,[24] and (3) the restroom.[25]   Plaintiff asserts that

---

[22] Defendants make the same objections – plaintiff is not an expert, and has not produced "one single measurement" – that are fully disposed of by _Strong_.   Indeed, _Strong_ expressly and specifically rejected the argument that plaintiff's testimony is insufficient because he "'does not assert he is an ADA expert or is otherwise qualified to opine whether certain conditions constitute barriers within the meaning of the Act,'" because "these are not the kind of facts for which expert testimony is necessary."   _Strong_, 724 F.3d at 1046.

It is worth noting here that the ADA places the burden on defendants to ensure that their public accommodations do not discriminate against persons with disabilities by denying them full and equal access to those facilities.   The law does not place the burden on plaintiff, a wheelchair-bound person, to lug around a measuring stick, a surveyor's transit and the ADA Accessibility Guidelines (ADAAG), and to constantly have an expert at his side, whenever he ventures out of his home.   _See_ _Strong_, 724 F.3d at 1046 ("The ADA was enacted as a boon to disabled people, not expert witnesses.   Specialized or technical knowledge is not required to understand Strong's straightforward assertions").

[23] A new, compliant ramp was built.   Pl. Motion (ECF No. 41-1) at 15-16.

[24] The accessible parking spot was moved.   Pl. Motion (ECF No. 41-1) at 16.

[25] The temporary barrier (a trash can) was removed from underneath

the sales and leasing office is still not accessible to him.

## II.   SUMMARY JUDGMENT STANDARDS

### A.   Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (it is the movant's burden "to demonstrate that there is 'no genuine issue as to any material fact' and that the movant is 'entitled to judgment as a matter of law'"); Walls v. Central Contra Costa Transit Authority, 653 F.3d 963, 966 (9th Cir. 2011) (per curiam) (same).

Consequently, "[s]ummary judgment must be denied" if the court "determines that a 'genuine dispute as to [a] material fact' precludes immediate entry of judgment as a matter of law." Ortiz v. Jordan, 562 U.S. ___, 131 S. Ct. 884, 891 (2011) (quoting Fed. R. Civ. P. 56(a)); Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011) (en banc) (same), cert. denied, 132 S. Ct. 1566 (2012).Under summary judgment practice, the moving party bears the initial responsibility of informing the district court of the basis for its motion, and "citing to particular parts of the materials in the record," Fed. R. Civ. P. 56(c)(1)(A), that show "that a fact cannot be ... disputed." Fed. R. Civ. P. 56(c)(1); Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Securities Litigation), 627 F.3d 376, 387 (9th Cir. 2010) ("The

---

the sink.  Pl. Motion (ECF No. 41-1) at 16-17.

1   moving party initially bears the burden of proving the absence of

2   a genuine issue of material fact") (citing Celotex v. Catrett,

3   477 U.S. 317, 323 (1986)).

4       A wrinkle arises when the non-moving party will bear the

5   burden of proof at trial. In that case, "the moving party need

6   only prove that there is an absence of evidence to support the

7   non-moving party's case." Oracle Corp., 627 F.3d at 387.

8       If the moving party meets its initial responsibility, the

9   burden then shifts to the non-moving party to establish the

10  existence of a genuine issue of material fact. Matsushita Elec.

11  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86 (1986);

12  Oracle Corp., 627 F.3d at 387 (where the moving party meets its

13  burden, "the burden then shifts to the non-moving party to

14  designate specific facts demonstrating the existence of genuine

15  issues for trial"). In doing so, the non-moving party may not

16  rely upon the denials of its pleadings, but must tender evidence

17  of specific facts in the form of affidavits and/or other

18  admissible materials in support of its contention that the

19  dispute exists. Fed. R. Civ. P. 56(c)(1)(A).

20      "In evaluating the evidence to determine whether there is a

21  genuine issue of fact," the court draws "all reasonable

22  inferences supported by the evidence in favor of the non-moving

23  party." Walls, 653 F.3d at 966. Because the court only

24  considers inferences "supported by the evidence," it is the non-

25  moving party's obligation to produce a factual predicate as a

26  basis for such inferences. See Richards v. Nielsen Freight

27  Lines, 810 F.2d 898, 902 (9th Cir. 1987). The opposing party

28  "must do more than simply show that there is some metaphysical

14

1  doubt as to the material facts ....  Where the record taken as a

2  whole could not lead a rational trier of fact to find for the

3  nonmoving party, there is no 'genuine issue for trial.'"

4  Matsushita, 475 U.S. at 586-87 (citations omitted).

5  **III. ANALYSIS**

6  Plaintiff sues under Title III of the ADA.  That statute

7  provides:

8      No individual shall be discriminated against
       on the basis of disability in the full and
9      equal enjoyment of the goods, services,
       facilities, privileges, advantages, or
10     accommodations of any place of public
       accommodation by any person who owns, leases
11     (or leases to), or operates a place of public
       accommodation.
12

13  42 U.S.C. § 12182(a); PGA Tour, Inc. v. Martin, 532 U.S. 661,

14  675-676 (2001) ("To effectuate its sweeping purpose, the ADA

15  forbids discrimination against disabled individuals in major

16  areas of public life, among them … public accommodations (Title

17  III)").  Plaintiff alleges that he was denied the full and equal

18  enjoyment of the Clubhouse and its restroom, the sales and rental

19  office (located inside the Clubhouse), and the parking lot

20  serving the Clubhouse and the office.  Both sides seek summary

21  judgment or partial summary adjudication.

22      **A.    "Operate, Lease or Manage."**

23  Defendants assert that they cannot be liable for any ADA

24  violations because they do not "operate, lease or manage" the

25  mobile home park.  ECF No. 35-1.  The argument ignores the plain

26  language of the statute and the controlling Ninth Circuit case on

27  the issue, Botosan v. Paul McNally Realty, 216 F.3d 827, 833 (9th

28

1   Cir. 2000).[26]

2        The plain language of Title III of the ADA imposes

3   compliance obligations on any person who "owns, leases (or leases

4   to), or operates a place of public accommodation."   42 U.S.C.

5   § 12182(a) (emphasis added).   Defendants have offered no

6   explanation for why it matters that they do not "operate, lease

7   or manage" the park, even though they own it.   Defendants concede

8   that they own the Clubhouse building, that they own the land

9   under the mobile home park, and that the residents lease the land

10  from defendants, making them the landlord.   The controlling Ninth

11  Circuit authority on this issue establishes that as long as

12  defendants are the landlords of a place of public accommodation,

13  they are liable under Title III of the ADA.   Botosan, 216 F.3d at

14  833 ("a landlord has an independent obligation to comply with the

15  ADA").[27]

16       In Botosan, the landlord by contract assigned responsibility

17  for ADA compliance to the manager.   The Ninth Circuit

18  acknowledged the landlord's right to allocate responsibility in

19  this way, as between the landlord and the manager.   However, this

20  _____

21  [26] Defendants, somewhat surprisingly, do not cite or discuss this
    case, even after plaintiff identified it as the controlling Ninth

22  Circuit authority on the issue in their own summary judgment
    motion (ECF No. 41 at 21).

23

24  [27] For this reason, it would not seem to matter that the
    Activities Committee, rather than defendants directly, ran the

25  Bingo games, and the craft sale, in the Clubhouse.   Defendants
    have not offered any evidence that they were unaware of these

26  activities, or that they were unaware that the Clubhouse was open
    to the public.   For that matter, it is not clear if their lack of

27  knowledge would make any difference since, as noted, they are the
    landlord.

28

assignment did not divest the landlord of its responsibility to third parties to comply with the ADA.  Id.  Indeed:

> Both the landlord who owns the building that houses a place of public accommodation and the tenant who owns or operates the place of public accommodation are public accommodations subject to the requirements of this part.

28 C.F.R. § 36.201(b).  Thus, the owner itself "is a 'public accommodation,' which triggers coverage under Title III."  Botosan, 216 F.3d at 833.

### B.   The Mobile Home Park Is Not a Public Accommodation.

Defendants assert that the mobile home park is not a public accommodation, and therefore not covered by Title III.[28] Plaintiff does not dispute the point, because plaintiff does not assert that the mobile home park itself is a public accommodation or must be Title III compliant.  Rather, plaintiff asserts that the enumerated facilities physically located within the mobile home park – the Clubhouse and its restroom, the rental and sales office and the parking lot – are public accommodations, and must

---

[28] Defendants argue that plaintiff filed the wrong type of case. Since defendants believe that plaintiff is suing because the mobile home park itself is not accessible, they argue that plaintiff should have filed a Fair Housing Act claim, see 42 U.S.C. §§ 3601, et seq., not an ADA claim.  They argue that it is sanctionable conduct for plaintiff to pursue this case as an ADA case.  It is not clear to the court why defendants cannot seem to grasp that plaintiff is entitled to file an ADA claim where, as here, he credibly asserts that the Clubhouse and its restroom, the sales and leasing office and the parking lot were public accommodations at the time he tried to use them.  The very first paragraph of plaintiff's complaint makes clear that mobile home park itself is not alleged to be the problem, but rather the "Clubhouse, Rental Office and Adjacent Parking."

1  comply with Title III.[29]

2      None of these facilities are categorically excluded from the

3  definition of "public accommodations," and indeed, each is

4  plainly included in that definition, given the undisputed facts

5  of this case.

6      The Clubhouse, according to the undisputed evidence, was

7  publicly advertised as a place for the general public to come and

8  play Bingo, at least until February 12, 2014.  Title III defines

9  the following as public accommodations:

10          * an auditorium, convention center, lecture
            hall or other place of public gathering;
11
12          * a gymnasium, health spa, bowling alley,
            golf course, or other place of exercise or
13          recreation;

14          * a motion picture house, theater, concert
            hall, stadium, or other place of exhibition
15          or entertainment; and

16          * a park, zoo, amusement park, or other place
            of recreation.

17  42 U.S.C. § 12181(7); 28 C.F.R. § 36.104 (implementing

18  regulations).

19      The rental and sales office, according to the undisputed

20  evidence, was a place where the public was invited as part of the

21  park's efforts to sell mobile homes and lease spaces, at least

22  until February 12, 2014.  That would make the office a place of

23  public accommodation.  In addition, the ADA Title III Technical

24  Assistance Manual states that a rental office located within a

25  ───────────────
   [29] Defendants' extensive discussion of cases excluding residential
26  facilities in general from Title III – mobile home parks, rented
   mobile home lots, residential complexes, apartments and
27  condominiums, apartment buildings and residential senior citizen
   housing facilities – is therefore simply irrelevant.
28
                                   18

private residential complex is a place of public accommodation that is subject to the ADA.  See Section III-1.2000, ADA Title III Technical Assistance Manual, http://www.ada.gov/taman3.html ("ILLUSTRATION 3: A private residential apartment complex contains a rental office.  The rental office is a place of public accommodation");[30] Johnson v. Laura Dawn Apartments, LLC, 2012 WL 33040 at *1 n.1 (E.D. Cal. 2012) (Hollows, M.J.) ("[t]he leasing office of an apartment complex is a place of public accommodation, despite the fact that the apartments themselves are not subject to the ADA").

Finally, the parking lot and restroom are plainly places of public accommodation, at least until February 12, 2014, since they served the Clubhouse and the sales office.

**C.   The Clubhouse.**

Defendants assert that the Clubhouse is entirely exempt from Title III of the ADA because (1) it is a "private club" and (2) it is not in fact open to the public.[31]  Title III of the ADA

---

[30] The ADA directs the U.S. Attorney General "to render technical assistance explaining the responsibilities of covered individuals and institutions," Bragdon v. Abbott, 524 U.S. 624, 646 (1998) (citing 42 U.S.C. § 12206), "and to provide 'appropriate technical assistance manuals to individuals or entities with rights or duties' under Title III." Miller v. California Speedway Corp., 536 F.3d 1020, 1024 (9th Cir. 2008), cert. denied, 555 U.S. 1208 (2009).  The ADA Title II Technical Assistance Manual provides the Attorney General's technical assistance, as contemplated by the statute.

[31] It is possible for an establishment to be described by Title III as a "public accommodation," but still not be subject to Title III, because it is not "in fact" open to the public.  See Jankey v. Twentieth Century Fox Film Corp., 212 F.3d 1159 (9th Cir. 2000) (Commissary, Studio Store and ATM located on a closed, private film company lot are exempt from Title III because they are not open to the public at large).

1   "shall not apply to private clubs or establishments exempted from

2   coverage under title II of the Civil Rights Act of 1964."  42

3   U.S.C. § 12187.  Title II of the Civil Rights Act of 1964, in

4   turn, "shall not apply to a private club or other establishment

5   not in fact open to the public."  42 U.S.C. § 2000A(e).

6   Accordingly, two types of establishments are exempted from Title

7   III of the ADA, namely, "private clubs," and establishments that,

8   even if they are not private clubs, are "not in fact open to the

9   public."  These are plainly affirmative defenses, as to which

10  defendants will have the burden of proof at trial.

11              **1.   Private Club.**

12      Neither Title III of the ADA, nor Title II of the Civil

13  Rights Act of 1964 (upon which Title III of the ADA relies for

14  its definition of exempt establishments), defines what a "private

15  club" is.  However, an irreducible minimum is that the

16  establishment not be open to the public at large.[32]  <u>Clegg v. Cult</u>

17  _____

18  [32] It would also appear that it must be a "club."  The EEOC, which
    is charged with interpreting and enforcing 42 U.S.C. § 2000a(e),
19  says in its Compliance Manual:

20          A "club" is defined as follows:

21          an association of persons for social and
            recreational purposes or for the promotion of
22          some common object (as literature, science,
            political activity) usually jointly supported
23          and meeting periodically, membership in
            social clubs usually being conferred by
24          ballot and carrying the privilege of use of
            the club property.
25
    EEOC Compliance Manual, § 2-III(B)(4)(a)(ii) ("Bona Fide Private
26  Membership Clubs), <u>eeoc.gov/policy/docs/threshold.html#2-III-B-4-</u>
    <u>a-ii</u>.  Defendants have presented no evidence that the Clubhouse
27  or its "membership" has any of these characteristics.  Instead,
    all "members" simply live in the mobile home park.
28

                           20

1  Awareness Network, 18 F.3d 752, 755 n.3 (9th Cir. 1994) ("[o]nly

2  when the facilities are open to the public at large does Title II

3  [of the Civil Rights Act of 1964] govern").

4      It is undisputed that from 2004, when plaintiff moved into

5  the park, until two days before the summary judgment motion was

6  filed (February 12, 2014) – when defendants took action to make

7  the Clubhouse off-limits to the general public – the Clubhouse

8  was open to the general public.  Prior thereto, the general

9  public was invited to come to the Clubhouse to play Bingo, and it

10 in fact played Bingo there.  The general public was invited to

11 come to the Clubhouse for the semi-annual craft fair held there,

12 and it in fact came to the Clubhouse for that event.  The general

13 public used the restroom in the Clubhouse during these events.

14     Even taking defendants at their word that the public was

15 excluded from the Clubhouse starting on February 12, 2014, they

16 have not shown that the Clubhouse has suddenly become a "private

17 club."  Defendants have not offered any evidence showing that the

18 Clubhouse, even now, exhibits the characteristics that are

19 normally associated with a "private club," other than the above-

20 noted sudden decision to exclude the general public.  Although,

21 as noted, the relevant statutes do not specifically define what a

22 "private club" is, the cases interpreting the term have

23 identified some key (often overlapping) characteristics.  See,

24 e.g., U.S. v. Lansdowne Swim Club, 713 F. Supp. 785 (E.D. Pa.

25 1989) (exhaustively and persuasively analyzing the "private club"

26 exemption, and setting out key characteristics), aff'd, 894 F.2d

27

28

21

1  83 (3rd Cir. 1990).

2      **First**, private clubs exhibit a "plan or purpose of

3  exclusiveness."   See Sullivan v. Little Hunting Park, Inc., 396

4  U.S. 229, 236 (1969) ("The Virginia trial court rested on its

5  conclusion that Little Hunting Park was a private social club.

6  But we find nothing of the kind on this record. There was no plan

7  or purpose of exclusiveness.  It is open to every white person

8  within the geographic area, there being no selective element

9  other than race"); Tillman v. Wheaton-Haven Recreation Ass'n,

10 Inc., 410 U.S. 431, 438 (1973) ("[t]he only restrictions are the

11 stated maximum number of memberships and … the requirement of

12 formal board or membership approval").[33]  In Sullivan, every

13 person who was a resident (by owning or renting) of the relevant

14 area of Fairfax County, Virginia, and purchased a membership (or

15 had one assigned by the owner), was welcome as a member, so long

16 as he was white.

17      The Clubhouse exhibits no plan or purpose of exclusivity,

18 and in any event, it exhibits even less than was shown in

19 Sullivan and Tillman.  The only undisputed requirement for

20 "membership" in the Clubhouse, assuming for the sake of argument

21 that there is such a thing as "membership" in the Clubhouse, is

22 residence in the mobile home park, period.  Defendants have not

23 even asserted that there is any other membership criterion.  For

24 example, defendants have offered no evidence that a membership

25 board grants or refuses memberships, as was the case in Sullivan

26 _____

27 [33] See also, ADA Technical Assistance Manual, § III-1.6000(2) (a
   characteristic of exempt private clubs is that "the membership
   selection process is highly selective").

28

1  and Tillman, or that the "membership" of the Clubhouse has any

2  say in who is admitted and who is not.  To the contrary, the

3  defendants' own evidence is that the only requirement for

4  membership is residence in the mobile home park.

5      **Second**, defendants have offered no evidence that the

6  Clubhouse's "members" have any control over the Clubhouse, or any

7  ownership of it, two attributes traditionally associated with

8  private clubs.  In Daniel v. Paul, 395 U.S. 298, 301 (1969), the

9  Court, interpreting 42 U.S.C. § 2000a(e), found that the

10  establishment was not a private club.  It had "none of the

11  attributes of self-government and member-ownership traditionally

12  associated with private clubs."[34]

13      Indeed, defendants' own evidence shows that the "members"

14  have no control over the Clubhouse.  Defendants assert that Mark

15  Weiner – on behalf of the owners and managers – shut the

16  Clubhouse down to the public.  The evidence is that the supposed

17  "members" were simply dictated to, not that the "membership" made

18  a decision to close the Clubhouse to the public, or to stop the

19  Bingo games.  The evidence submitted by both sides shows that the

20  "members" are at the mercy of management, which is apparently

21  entitled to shut down Bingo and the craft fair, and to ban the

22  public from the Clubhouse.  There is no indication anywhere that

23  the "members" had any say in this.

24      **Third**, the history of the club "is relevant to show whether

25

26  [34] The courts "have been most inclined to find private club
    status" in cases where the "[m]embers exercise a high degree of

27  control over club operations."  ADA III Technical Assistance
    Manual § III-1.6000(1).

28

                                  23

it was created to avoid the effect" of the ADA.  <u>See</u> <u>Lansdowne</u>,
713 F. Supp. at 802 (citing <u>Daniel</u>).[35]  In this case, the
undisputed evidence plainly shows that the Clubhouse was not a
private club up until two days before defendants filed a motion
to have the Clubhouse exempted from Title III of the ADA.[36]  The
history of the Clubhouse is also relevant to show that one
purpose of the Clubhouse, until February 12, 2014, was to draw
the public into the mobile home park, as evidenced by its

---

[35] "It is true that following enactment of the Civil Rights Act of
1964, the Pauls began to refer to the establishment as a private
club.  They even began to require patrons to pay a 25-cent
'membership' fee, which gains a purchaser a 'membership' card
entitling him to enter the Club's premises for an entire season
and, on payment of specified additional fees, to use the
swimming, boating, and miniature golf facilities.  But this
'membership' device seems no more than a subterfuge designed to
avoid coverage of the 1964 Act."  <u>Daniel</u>, 395 U.S. at 301-02.

[36] The courts "have been most inclined to find private club
status" where "[t]he club was not founded specifically to avoid
compliance with Federal civil rights laws."  ADA III Technical
Assistance Manual § III-1.6000(5).

Historically, it was not unheard of for establishments that were
<u>open</u> to every white person on earth, to magically transform
themselves into "private clubs" (now <u>restricted</u> to every white
person on earth), after passage of the Civil Rights Act of 1964.
<u>See e.g.</u>, <u>U.S. v. Richberg</u>, 398 F.2d 523 (5th Cir. 1968)
(Goldberg, J.) (a café is still just a café even after the owner
declared it a "private club" to avoid serving black customers).

At oral argument, defendants' counsel stated that she hoped the
court would not consider her to be a "bad person," apparently
because of her "private club" argument.  The court can assure
counsel that its views on this matter are not personal.  However,
defendants' deployment of this transparent attempt to avoid a
civil rights law – suddenly declaring a public accommodation to
be a "private club" – is an odd choice that unavoidably raises a
comparison to the use of the same tactics during the Civil Rights
Era.

1  advertising of the yard sale, Bingo, and the craft sales.  Thus,

2  the evidence is that the Clubhouse was never intended to be a

3  "private club," but rather a place of public gathering.

4      In addition, it is undisputed that the Clubhouse housed the

5  rental and sales office.  The general public therefore were

6  invited to come into the Clubhouse so that they could get to the

7  rental and sales office.

8      **Fourth**, the court can consider the formalities observed by

9  the purported club, such as fees, membership cards, bylaws, and

10  the like.  See Lansdowne, 713 F. Supp. at 797.[37]  The defendants

11  have offered no evidence that the Clubhouse has any of these.

12  Rather, it is simply a facility that residents are free to use,

13  like the restroom.  Under defendants' definition, the restroom in

14  the Clubhouse would be a "private club."

15      Indeed, defendants have not even provided any evidence that

16  there is such a thing as "membership" in the Clubhouse.  It is

17  undisputed that nobody ever told plaintiff that he was a "member"

18  of the Clubhouse, that he did not know that he was a member, that

19  he was never issued a membership card and that he was never

20  charged membership fees.  There is no evidence that anyone else

21  is a member, or knows that they are members.[38]

22      In short, defendants have not shown with undisputed facts,

23

24  [37] The courts "have been most inclined to find private club
25  status" in cases where "[s]ubstantial membership fees are
    charged."  ADA III Technical Assistance Manual § III-1.6000(3).

26  [38] Defendants have not asserted that membership in the Clubhouse
27  is so exclusive that even its own members are unaware of their
    membership, so the court will not consider that possibility.

28
                                    25

or any facts, that the Clubhouse is a "private club."

### 2.   Whether the Clubhouse is "in fact not open to the public."

Even if the Clubhouse is not a private club, it can still be exempted from the reach of Title III of the ADA if it is "in fact not open to the public." 42 U.S.C. § 2000a(e). As discussed above, it is undisputed that the Clubhouse was open to the public at least as recently as February 12, 2014.

The Clubhouse's status after February 12, 2014 is genuinely in dispute. The Clubhouse houses the sales and leasing office which, as discussed below, may still be open to the public despite defendants' protestations.

### D.   The Leasing and Sales Office.

Defendants assert that the leasing and sales office (which appears to be the same office plaintiff refers to as the "rental office"), located inside the Clubhouse, is also not a public accommodation because it is "no longer open to the public." In support, defendants assert that, "[a]s of February 12, 2014," two days before the summary judgment motion was filed, "the Clubhouse is no longer used for leasing and sales by Calaveras Valley Village, LLC." Weiner SJ Decl. (2-14-2014) ¶ 4 (emphasis added).

Kalani himself has observed "visitors to the Castle Park mobile home park use the parking spaces next to the Clubhouse while they look at vacant lots or meet with representatives inside the Clubhouse," for the purpose of looking to purchase mobile homes or vacant lots. Kalani Oppo. Decl. (2-28-2014) ¶ 6. Kalani himself has observed "for sale" signs in mobile home windows, directing passersby to the clubhouse to talk to an agent

26

1    located there, after February 12, 2014 (the date defendants say

2    all sales activity ceased in the office).  Id., ¶¶ 8 & 9.

3        Also, plaintiff has submitted evidence that the office is

4    still being used as a sales office.  See Kalani Oppo. Decl.

5    (2-28-2014) ¶ 7 (plaintiff witnessed apparent sales activity

6    operating out of the sales office of February 18, 2004, after it

7    was supposedly closed to such activities).  Plaintiff has

8    submitted his own declaration, testifying that even after

9    February 12, 2014, he witnessed members of the public gathering

10   at the Clubhouse (even if they did not go inside), and meeting

11   there (just outside the Clubhouse) with a management sales agent,

12   for the apparent purpose of looking to buy a home at the park.

13   R. Kalani Oppo. Decl. (2-28-2014) ¶ 7.  The sales agent, however,

14   did go inside the Clubhouse to access the sales office during

15   this meeting with the prospective purchasers or renters.  Id.

16       Thus, there is evidence that the sales office, located

17   inside the Clubhouse, is still being used for sales and/or

18   leasing purposes.  Moreover, it is a reasonable inference from

19   this new "exclusion" of the public from the office – with the

20   sales agent running back and forth from the door of the Clubhouse

21   to the sales office, rather than simply having the prospective

22   tenants sit in the sales office – that this is simply a temporary

23   subterfuge to avoid compliance with the ADA.  In any event it is

24   not clear if, as a matter of law, the public is truly being

25   "excluded" from the Clubhouse if potential purchasers come all

26   the way to the front door, transact business there with an agent

27   inside, and sit in sales meetings directly outside the front

28   door.

Defendants now state that as of March 10, 2014, they have absolutely, positively, stopped all on-site sales activities, and that only off-site agents conduct sales and leasing activities. Declaration of Mark Weiner (March 10, 2014) ("Weiner Reply Decl. (3-10-2014)") (ECF No. 42-2) ¶ 12.  Perhaps this is so, but the voluntary cessation of allegedly discriminatory behavior does not necessarily moot the controversy.  City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289 (1982).  Defendants' assertion that they will now force prospective buyers and lessors to meet agents off-site, abandoning the obviously more convenient use of the on-site sales and leasing office, does not give the court great confidence that it is a genuine, irreversible change in defendants' operations.

**E.    The Parking Space.**

It is undisputed that the parking lot served the Clubhouse and the rental and sales office when those facilities were open to the public (prior to February 12, 2014).  It is also undisputed that the parking lot and ramp were not accessible to plaintiff during that time.

However, it is also undisputed that the accessible parking space and ramp no longer prevent plaintiff from the full and equal enjoyment of the Clubhouse, restroom, the sales and leasing office and parking lot itself.  An actual structural change to make a facility ADA-compliant, even when completed after the ADA lawsuit is filed, is far less likely to be a subterfuge for avoiding the ADA.

////

////

28

1

**F.    Standing.**

2   Defendants properly cite Lujan v. Defenders of Wildlife, 504

3   U.S. 555 (1992), and Chapman v. Pier 1 Imports, 631 F.3d 939 (9th

4   Cir. 2011), in their "standing" argument, but fail to explain why

5   those cases deprive Kalani of standing.  Lujan set forth the

6   three elements of Article III standing, all of which plaintiff

7   meets.

8   "First, the plaintiff must have suffered an 'injury in fact'

9   — an invasion of a legally protected interest which is (a)

10   concrete and particularized, and (b) "actual or imminent, not

11   'conjectural' or 'hypothetical.'"  Lujan, 504 U.S. at 560.

12   "Second, there must be a causal connection between the

13   injury and the conduct complained of — the injury has to be

14   'fairly ... trace[able] to the challenged action of the

15   defendant, and not ... th[e] result [of] the independent action

16   of some third party not before the court.'"  Lujan, 504 U.S.

17   at 560.

18   "Third, it must be 'likely,' as opposed to merely

19   'speculative,' that the injury will be 'redressed by a favorable

20   decision.'"  Lujan, 504 at 561.

21

**a.    Injury in fact.**

22   Defendants assert that Kalani used the rental office and the

23   parking lot as a resident of the mobile home park, not as a

24   member of the public.  They argue that he has standing only if he

25   is "a member of the public going to use a public service" of the

26   mobile home park.  See ECF No. 35-1 at 12.

27   That is not so.  As the Ninth Circuit has stated:

28   ////

1

2

3

> Title III does not restrict its coverage to members of the public; it provides that "No individual shall be discriminated against" in the enjoyment of public accommodations by reason of disability.

Martin v. PGA Tour, Inc., 204 F.3d 994, 998 n.7 (9th Cir. 2000) (emphasis in text), aff'd, 532 U.S. 661 (2001).[39]  In other words, as long as the facility is a public accommodation, it may not discriminate against disabled individuals, regardless of their "member of the public" status when using the facility.  The relevant standing question therefore, is whether plaintiff is an "individual" within the meaning of the statute.  The statute defines covered "individuals" as "the clients or customers of the covered public accommodation."  42 U.S.C. § 12182(b)(1)(a)(iv).[40]  Therefore, the question is whether plaintiff is a "client[] or customer[]" of the rental and sales office, not whether he is a member of the public.

The undisputed evidence is that plaintiff is a customer or client of the rental and sales office.  He pays rent for the lot on which his mobile home is located, and he pays it to the rental and sales office.

////

---

[39] Defendants do not cite or discuss Martin, notwithstanding its clear language – "Title III does not restrict its coverage to members of the public" – that directly contradicts defendants' major argument for summary judgment, and notwithstanding that Martin is binding Ninth Circuit authority, affirmed by the Supreme Court.

[40] "For purposes of clauses (i) through (iii) of this subparagraph, 'individual or class of individuals' refers to the clients or customers of the covered public accommodation that enters into the contractual, licensing or other arrangement."  42 U.S.C. § 12182(b)(1)(a)(iv).

### b. Causal connection.

Defendants assert that Kalani lacks standing because he "lacks evidence necessary to show a causal connection between any claimed injury and the condition of the property as required by Chapman v. Pier 1 Imports, 631 F.3d 939 (9th Cir. 2011)." ECF No. 35-1 at 20. That is simply not true. Kalani's injury is that he is being denied the full and equal enjoyment of the clubhouse and its restroom, the rental office (located inside the clubhouse), and the parking lot serving the clubhouse and the office. He has produced evidence of a defective ramp, non-compliant parking, a non-compliant restroom in the Clubhouse, all of which he personally encountered, and a laundry list of other ADA violations.

### c. Injury must be redressed by a favorable decision.

Defendants assert that they have converted the Clubhouse into a "private club" – two days before filing their summary judgment motion – by banning Bingo there, by no longer using the sales office for sales, and by banning the yard sale and crafts sale.

This argument is predicated upon this court's accepting defendants' assertion that they have magically transformed the facilities – the Clubhouse, the rental and sales office, the restroom, and the parking lot – into a "private club" or otherwise completely excluded the public, notwithstanding the invitations to the public to come play Bingo at the Clubhouse, to participate in the craft sales there, and to use the restroom and parking lot in connection with those activities. However, even

1  if the court were to accept defendants' assertions, plaintiff's

2  injury can still be redressed through damages (statutory or

3  otherwise), available through the Unruh Act.

4          [S]o long as the plaintiff has a cause of
           action for damages, a defendant's change in
5          conduct will not moot the case.

6  Buckhannon Bd. and Care Home, Inc. v. West Virginia Dept. of

7  Health and Human Resources, 532 U.S. 598, 608-09 (2001)

8      Also, injunctive relief may still be available if the court

9  is convinced that defendants' sudden exclusionary actions are

10 simply a "voluntary cessation" of illegal discrimination that

11 could resume as soon as this lawsuit is over:

12         It is well settled that a defendant's
           voluntary cessation of a challenged practice
13         does not deprive a federal court of its power
           to determine the legality of the practice.
14         Such abandonment is an important factor
           bearing on the question whether a court
15         should exercise its power to enjoin the
           defendant from renewing the practice, but
16         that is a matter relating to the exercise
           rather than the existence of judicial power.
17

18 City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289

19 (1982).  Also, such voluntary cessation does not deprive this

20 court of its authority "'to determine the legality of the

21 practice' unless it is 'absolutely clear that the allegedly

22 wrongful behavior could not reasonably be expected to recur.'"

23 Buckhannon, 532 U.S. at 609 (quoting Friends of Earth, Inc. v.

24 Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167, 189

25 (2000)).

26     In short, plaintiff has standing, and this case is not

27

28
                                    32

1  moot.[41]

2        **F.    Sanctions.**

3        Defendants ask for sanctions, asserting that plaintiff's

4  lawsuit is frivolous.  Defendants seem particularly outraged that

5  plaintiff's attorney specializes in ADA cases, has filed 342 ADA

6  cases, has represented the same plaintiff in 54 of them, and has

7  gone to trial on an ADA case.  <u>See</u> DSUF ¶ 24.

8        This court is aware of no authority nor any basis in common

9  sense that would allow it to sanction plaintiff's counsel because

10 she has developed a specialty, litigated many cases within that

11 specialty, represented the same client on multiple occasions, and

12 gone to trial on at least one of those cases.  Indeed, it is

13 likely that counsel's specialization has made her aware of

14 controlling Ninth Circuit cases in this area.  Defendants,

15 meanwhile, have shown no awareness of at least two of these

16 authorities – <u>Strong</u> and <u>Martin</u> – even after plaintiff pointed

17 them out, and even though they completely disposed of the

18 arguments defendants were making.[42]

19 _____

20 [41] Defendants seek to dismiss the case on limitations grounds,
   apparently because plaintiff did not file suit in 2004, when he
21 first moved into the mobile home park and became aware of alleged
   ADA violations.  However, because plaintiff alleges that he
22 actually encountered the barriers, and that the violations were
   continuing at the time he filed his lawsuit (and that one
23 continues to this day), his suit is not time barred.  <u>See</u> <u>Pickern</u>
   <u>v. Holiday Quality Foods Inc.</u>, 293 F.3d 1133, 1137 (9th Cir.)
24 (discussing the effect of continuing violations on the statute of
   limitations), <u>cert. denied</u>, 537 U.S. 1030 (2002).
25

26 [42] Notwithstanding defendants' conduct, the court, being the soul
27 of patience, will not impose sanctions against defendants and
   their counsel <u>sua sponte</u>.
28

1     G.     **Plaintiff's Motion for Summary Judgment.**

2            1.     **The Sales and Leasing Office.**

3          The undisputed facts show that the sales and leasing office

4     was a public accommodation prior to February 12, 2014.  They also

5     show that prior to that date, plaintiff's full and equal use of

6     that office was denied because of the difficulty he faced in

7     using the ramp to the Clubhouse, which housed the office, and

8     when he drove there, the difficulty in using the designated

9     "accessible" parking space.

10         Plaintiff argues that the office was also inaccessible under

11    Title III because, as is undisputed, the door to Office One was

12    too narrow.  It is not clear to the court that this denies

13    plaintiff full and "equal" access, since he can enter Office One

14    through Office Two.  Presumably it would be inadequate if

15    plaintiff had to navigate a "separate labyrinth" to get into

16    Office One, as plaintiff describes it.  But it is not clear that

17    discrimination exists where the accessible entrance to Office One

18    is a few feet away from the non-accessible entrance:

19                 Contrary to her assertion, Bird does not
                   prevail on the ADA or Rehab claim simply
20                 because the College failed to provide her
                   with wheelchair access on a number of
21                 occasions.  Compliance under the Acts does
                   not depend on the number of locations that
22                 are wheelchair-accessible; the central
                   inquiry is whether the program, "'when viewed
23                 in its entirety, is readily accessible to and
                   usable by individuals with disabilities.'"
24                 <u>Barden v. City of Sacramento</u>, 292 F.3d 1073,
                   1075–76 (9th Cir. 2002) (quoting 28 C.F.R. §
25                 35.150(a)), <u>cert. denied</u>, 539 U.S. 958
                   (2003).
26
      <u>Bird v. Lewis & Clark College</u>, 303 F.3d 1015, 1021 (9th
27
      Cir. 2002), <u>cert. denied</u>, 538 U.S. 923 (2003). It appears that

28
                                    34

1   further factual development is needed to determine whether,

2   viewing the matter in its entirety, plaintiff is being denied

3   full and equal access to Office One.

4              **2.   Clubhouse and restroom.**

5        The undisputed facts show that prior to February 12, 2014,

6   the Clubhouse and restroom were public accommodations, and not

7   exempted from Title III as private clubs or otherwise.  They also

8   show that plaintiff was denied access to the Clubhouse and its

9   restroom because of the defective ramp and, when he drove there,

10  the defective accessible parking spot.

11             **3.   Parking Lot.**

12       The undisputed facts show that prior to February 12, 2014,

13  the parking lot was a public accommodation.  They also show that

14  plaintiff was denied access to the parking lot because of the

15  defective "accessible" parking spot.

16             **4.   Unruh Act.**

17       Plaintiff asserts that since defendants have violated the

18  ADA, plaintiff is "automatically" entitled to statutory damages

19  under the Unruh Act.  See Cal. Civ. Code §§ 51(f) (a violation of

20  the ADA is also a violation of the Unruh Act) & 52 (remedy for

21  violation of the Unruh Act includes actual damages and statutory

22  damages).  Plaintiff is correct.  See Munson v. Del Taco, Inc.,

23

24  46 Cal. 4th 661 (2009) (Section 51(f) provides "disabled

25  Californians injured by violations of the ADA with the remedies

26  provided by section 52").[43]

27  _____

28  [43] Since plaintiff bases his Unruh Act claim solely on the ADA

35

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### IV.   CONCLUSION

#### A.   Summary Adjudications.

For the reasons stated above, the court grants the following summary adjudications:

1.   Prior to February 12, 2014, the Clubhouse and restroom, the sales and leasing office and the parking lot – including the ramp to the Clubhouse and the accessible parking space – were operated as public accommodations during the time plaintiff attempted to use them.

2.   The Clubhouse is not, and never was, exempt from Title III of the ADA as a "private club."

3.   Prior to February 12, 2014, plaintiff was denied full and equal access, because of his disability, to the Clubhouse and restroom, to the sales and leasing office, and to the parking lot, by virtue of the non-compliant ramp leading to the Clubhouse, by virtue of the clutter under the restroom sink, and, when plaintiff drove to the Clubhouse, by virtue of the difficult-to-navigate "accessible" parking space, all in violation of Title III of the ADA and Section 51(f) of the Unruh Act, Cal. Civ. Code § 51(f).

4.   Plaintiff is no longer being denied full and equal access to the Clubhouse and its restroom, and the parking lot –

violation, rather than on an independent violation of the Unruh Act, he need not prove intentional discrimination.  See Greater Los Angeles Agency on Deafness, Inc., 742 F.3d 414, 425 (9th Cir. 2014) ("to establish a violation of the Unruh Act independent of a claim under the Americans with Disabilities Act ('ADA'), GLAAD must 'plead and prove intentional discrimination in public accommodations in violation of the terms of the Act'") (citing Munson).

1   together with the accessible parking spot and the ramp – because,

2   as plaintiffs concede, defendants have corrected the access

3   problems with regard to those facilities.

4       **B.   Defendants' Motions.**

5       1.   Defendants' motion for summary judgment is **DENIED**

6   in its entirety, because they have not shown that the public is,

7   or ever was, excluded from the challenged facilities.

8       2.   Defendants' motion for sanctions is **DENIED** in its

9   entirety, because plaintiff's lawsuit is not frivolous or

10   otherwise sanctionable.

11      **C.   Plaintiff's Motion.**

12      1.   Plaintiff's motion for summary judgment on his

13   claim for an injunction requiring defendants to widen the

14   entrance door to Office One is **DENIED**.  It is not clear that

15   plaintiff was ever denied full and equal access to that office

16   given that he can enter it through an alternate door a few feet

17   away.  Moreover, there is a genuine dispute about whether the

18   alternate door is ever locked when the door to Office One is

19   open, thus denying plaintiff access while granting access to

20   able-bodied persons.[44]

21      2.   Plaintiff's motion for summary judgment on his

22   Unruh Act claim is **GRANTED**, because he has established with

23

24   _____
     [44] Plaintiff does not move for summary judgment seeking an
25   injunction relating to the Clubhouse, restroom and parking lot,
     now that defendants have corrected the access problems relating
26   to those facilities.  However, the claim for injunctive relief
     relating to those facilities is not dismissed, because it is not
27   established that those facilities will never revert to non-
     accessible public accommodations, however unlikely that seems.

28
                                37

1  undisputed evidence, that defendants denied him full and equal

2  access to the Clubhouse, and its restroom, the sales and leasing

3  office, [45] and the parking lot, at least until February 12, 2014.

4       **D.   Issues Remaining for Trial.**

5            (1) Whether defendants violated Title III of the ADA

6  by virtue of the narrow entrance to Office One of the sales and

7  leasing office;

8            (2)  Whether the sales and leasing office is now exempt

9  from Title III of the ADA by being entirely closed to the general

10  public, and if so, whether an injunction is still needed to

11  enforce this voluntary cessation of allegedly illegal

12  discrimination; and

13            (3)  Whether an injunction or declaration should issue

14  regarding the Clubhouse and its restroom, and the parking lot, to

15  enforce defendants' voluntary cessation of allegedly illegal

16  discrimination.

17       IT IS SO ORDERED.

18       DATED:  April 14, 2014.

19

20

21

22                         LAWRENCE K. KARLTON
                          SENIOR JUDGE
23                         UNITED STATES DISTRICT COURT

24

25

26  _____

     [45] That is, by virtue of denying plaintiff access to the
27  Clubhouse, where the office is located.  As stated above, the
     denial of access because of the narrow doorway has yet to be
28  established.

                              38